13-3605 (L)
Jesner v. Arab Bank

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2014

(Argued:  December 2, 2014     Decided:  December 8, 2015

Amended: December 17, 2015)

Docket No. 13-3605; 13-3620; 13-3635; 13-4650; 13-4652

————————————

In Re: Arab Bank, PLC Alien Tort Statute Litigation[1]

————————————

Before:        Sack, Chin, and Carney, *Circuit Judges*.

The plaintiffs seek compensation for damages allegedly incurred as a result of armed attacks that took place in Israel, the West Bank, and the Gaza Strip between January 1995 and July 2005.  They appeal from the dismissal of claims they made under the Alien Tort Statute (the "ATS"), 28 U.S.C. § 1350, by the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*).  The basis for the dismissal was this Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) ("*Kiobel I*"), *aff'd on other*

---

[1] The Clerk of Court is respectfully directed to change the caption as shown above pursuant to this Court's January 6, 2014 order.  This concise caption refers to the five appeals described in the following notes.

*grounds*, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"), which construed the ATS as not permitting suits against corporate entities. We conclude that *Kiobel II* did not overrule *Kiobel I* on the issue of corporate liability under the ATS. We note nonetheless that *Kiobel II* appears to suggest that the ATS may indeed allow for corporate liability—a reading of the statute that several of our sister circuits have adopted. Even were we to agree with that view, however, as a three-judge panel, we would not be free to overrule the law established by the previous decision of the *Kiobel I* panel. The order of the district court is therefore:

AFFIRMED.

MICHAEL E. ELSNER (John M. Eubanks, *on the brief*), Motley Rice LLC, Mount Pleasant, South Carolina, *for Plaintiffs–Appellants*.

Mark Werbner and Joel Israel, Sayles Werbner, PC, Dallas, Texas, (*on the brief*), *for Plaintiffs–Appellants*.

KEVIN WALSH (Douglas W. Mateyaschuk, II, Steven J. Young, *on the brief*), DLA Piper LLP, New York, New York, *for Defendant–Appellee*.

Stephen M. Shapiro, Timothy S. Bishop, Chad M. Clamage, Mayer Brown LLP, Chicago, Illinois, (*on the brief*), *for Defendant–Appellee*.

Richard L. Herz, EarthRights International, Washington, D.C., *for Amici Curiae–Human Rights Organizations.*

Tyler R. Giannini, Harvard Law School, International Human Rights Clinic, Cambridge, Massachusetts, *for Amici Curiae–Professors of Legal History Barbara Aronstein Black, William R. Casto, Martin S. Flaherty, Nasser Hussain, Stanley N. Katz, John V. Orth, and Anne-Marie Slaughter.*

Neal Kumar Katyal and Jessica L. Ellsworth, Hogan Lovells US LLP, Washington, D.C., *for Amicus Curiae–The Hashemite Kingdom of Jordan.*

Douglas Hallward-Driemeier, Ropes & Gray LLP, Washington, D.C., *for Amicus Curiae–Union of Arab Banks.*

Jeffrey B. Wall, Sullivan & Cromwell LLP, Washington D.C., *for Amicus Curiae– Institute of International Bankers.*

SACK, *Circuit Judge*:

The plaintiffs in this case filed five separate lawsuits between 2004 and 2010 in the United States District Court for the Eastern District of New York against the defendant, Arab Bank, PLC. *Oran Almog, et al. v. Arab Bank, PLC*, No. 04-CV-5564 (E.D.N.Y. filed Dec. 21, 2004)[2]; *Gila Afriat-Kurtzer, et al., v. Arab Bank,*

---

[2] On appeal, this case has been docketed as *Joseph Zur, et al. v. Arab Bank, PLC* inasmuch as Zur is an alien who has a claim arising under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"), which provides relief exclusively for "aliens." The lead

*PLC*, No. 05-CV-0388 (E.D.N.Y. filed Jan. 21, 2005)[3]; *Joseph Jesner, et al. v. Arab Bank, PLC*, No. 06-CV-3869 (E.D.N.Y. filed Aug. 9, 2006); *Yaffa Lev, et al. v. Arab Bank, PLC*, No. 08-CV-3251 (E.D.N.Y. filed Aug. 11, 2008); *Viktoria Agurenko, et al. v. Arab Bank, PLC*, No. 10-CV-0626 (E.D.N.Y. filed Feb. 11, 2010).

The plaintiffs are aliens who were injured or captured by terrorists overseas, or family members and estate representatives of those who were injured, captured, or killed. The plaintiffs seek judgments against Arab Bank, PLC—a bank headquartered in Jordan with branches in various places around the world—for allegedly financing and facilitating the activities of organizations that committed the attacks that caused the plaintiffs' injuries. It is undisputed that, as a PLC,[4] Arab Bank is a corporation for purposes of this appeal.

The plaintiffs allege violations by Arab Bank of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333(a) (providing that "[a]ny national of the United States

---

plaintiff in the district court, Oran Almog, is an American citizen and does not make a claim under the ATS. Because Almog has no claim at issue on this appeal, the case has been docketed under the name of a plaintiff who does.

[3] On appeal, this case has been docketed as *Oded Avrlingi, et al. v. Arab Bank, PLC* because the lead plaintiff in the district court, Gila Afriat-Kurtzer, is an American citizen and does not make a claim under the ATS. The case has been docketed under the name of a plaintiff who does bring an ATS claim.

[4] "PLC," sometimes written in the lower-case, "plc," is the abbreviation for "public limited company." *See, e.g., Maxwell Commc'n Corp. plc by Homan v. Societe Generale*, 93 F.3d 1036, 1040 (2d Cir. 1996).

injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States"), the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS")[5] (providing that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"), and federal common law.[6] The ATS differs from the ATA in that, among other things, it provides jurisdiction *only* with respect to suits by "aliens," while the ATA provides jurisdiction *only* for suits by "national[s] of the United States."[7]

Between 2007 and 2010, the plaintiffs' federal common-law claims were dismissed as redundant and lacking what the district court called a "sound

---

[5] The ATS is sometimes referred to as the Alien Tort Claims Act, or ATCA. *See, e.g.*, *Linde v. Arab Bank, PLC*, 706 F.3d 92, 95 (2d Cir. 2013); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 899 n.32 (2d Cir. 2011) (referring to "the Alien Tort Claims Act (also commonly called the Alien Tort Statute)").

[6] More precisely: *Almog*, No. 04-CV-5564, Dkt. Nos. 7 ¶ 4, 1250 ¶ 101 (bringing ATA, ATS, and "general federal common law" claims); *Afriat–Kurtzer*, No. 05-CV-0388, Dkt. No. 3 ¶ 4 (bringing ATA, ATS, and "general federal common law" claims); *Jesner*, No. 06-CV-3869, Dkt. No. 336 ¶ 4 (bringing only ATS claims); *Lev*, No. 08-CV-3251, Dkt. No. 1 ¶ 4 (bringing ATS claims and "general federal common law" claims); *Agurenko*, No. 10-CV-0626, Dkt. No. 1 (bringing only ATS claims).

[7] Non-nationals can recover under the ATA only if they are survivors or heirs of a U.S. national injured by international terrorism. 18 U.S.C. § 2333(a).

basis."[8]  On May 24, 2013, the defendant also moved to dismiss the plaintiffs' ATS claims, arguing that the law of this Circuit prohibits ATS suits against corporate entities.  In their briefing in the district court, the plaintiffs responded to the defendant's arguments on their merits but also argued, in the alternative, that if the district court granted the defendant's motion, it should also reinstate the plaintiffs' federal common-law claims or permit the plaintiffs to plead related non-federal common-law claims.

On August 23, 2013, the district court issued the following order:

> The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS.  *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *aff'd, Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013).  A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." *Baraket v. Holder*, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed [this Circuit's *Kiobel* decision] on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as

---

[8] *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 294 (E.D.N.Y. 2007) (dismissing the plaintiffs' common law claims in *Almog* (now *Zur*) and *Afriat–Kurtzer* (now *Avrlingi*) because the "[p]laintiffs have offered no sound basis for these . . . claims," and because "plaintiffs agreed that such claims would be 'redundant' of the ATS claims"); *see also Lev*, No. 08-CV-3251, Dkt. No. 30 (E.D.N.Y. Jan. 29, 2010) (dismissing the plaintiffs' common-law claims for the same reasons).

> redundant, but also because Plaintiffs offered "no sound basis" for them. *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories.

*Jesner v. Arab Bank*, 06-CV-3869, Unnumbered Dkt. Entry on Aug. 23, 2013. Soon thereafter, judgments on the pleadings were entered in each of the individual cases as to the ATS claims. The plaintiffs filed timely appeals as to these claims.[9]

On appeal, the plaintiffs argue principally that this Circuit's opinion in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) ("*Kiobel I*"), *aff'd on other grounds*, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"), when analyzed in light of the Supreme Court's decision in *Kiobel II*, is no longer "good law," or at least, does not control this case. The plaintiffs also contend that the facts alleged sufficiently touch and concern the territory of the United States as required under *Kiobel II* to support jurisdiction, although they request that we remand to the district court for an initial decision on this issue. Finally, and in the alternative, the plaintiffs request the opportunity either to

---

[9] The ATS and ATA claims were bifurcated in the district court. The ATA claims are not at issue on this appeal, but we note that in 2014, a jury rendered a verdict on liability in favor of the plaintiffs in those cases. *See, e.g.*, Stephanie Clifford, *Jury Finds Arab Bank Liable for Aiding Terror*, N.Y. Times, Sept. 23, 2014, at A1, *online version available at* http://www.nytimes.com/2014/09/23/nyregion/arab-bank-found-guilty-of-supporting-terrorist.html. The verdict was upheld in large part by the district court in response to the defendant's post-trial motions. *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015).

reinstate their federal common-law claims or to amend their pleadings in order to plead non-federal common-law claims.

# BACKGROUND

## I. The Plaintiffs' Claims

The plaintiffs in the underlying cases are U.S. and foreign nationals who have brought suit against Arab Bank for its alleged role in facilitating terrorist operations that harmed the plaintiffs. While the underlying cases contain differing factual allegations, they are, as the plaintiffs assert, "based on the same nucleus of [purported] material facts." Appellants' Br. at 1 n.1. In recounting those facts to this Court, the plaintiffs' briefing relies heavily on the operative, amended complaint in *Zur v. Arab Bank, PLC*. In providing a summary of the facts of this case, we therefore draw, at times verbatim, from the district court's thorough opinion addressing a previous motion to dismiss by Arab Bank in *Zur* (*sub nom. Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007)).[10]

According to the plaintiffs, over the past two decades, four prominent Palestinian terrorist organizations—the Islamic Resistance Movement

---

[10] In deciding the motion to dismiss in *Zur*, the district court assumed the truth of, and drew all favorable inferences from, the operative complaint's factual allegations. We apply the same standard (and so adopt the district court's factual analysis) in this appeal from a subsequent grant of the defendant's motion for judgment on the pleadings. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") (collectively "the terrorist organizations")[11]—have conducted widespread murderous attacks, including suicide bombings, against citizens of Israel— mostly Jews. The terrorist organizations allegedly arranged those attacks in part by promising, and later delivering, financial payments to the relatives of "martyrs" who were killed—along with those who were injured or captured— while perpetrating the attacks. *See Almog*, 471 F. Supp. 2d at 260-61.

The plaintiffs assert that the terrorist organizations funded these attacks in two ways. The organizations solicited public and private donations directly and deposited them in bank accounts throughout the Middle East. The organizations also raised funds through affiliated, purportedly charitable proxy organizations, including two entities created in Saudi Arabia: the Popular Committee for Assisting the Palestinian Mujahideen and the Saudi Committee for Aid to the Al– Quds Intifada (the "Saudi Committee"). These two organizations allegedly set up

---

[11] HAMAS, the PIJ, and the PFLP were each named a Specially Designated Terrorist entity ("SDT") by the U.S. government in 1995 and designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State in 1997. And HAMAS, the PIJ, and the AAMB have each been named a Specially Designated Global Terrorist Entity by the U.S. government.

their own bank accounts, under the shared label "Account 98," at various banks in Saudi Arabia in order to hold funds collected for the families of "martyrs." *See id.* at 261-62.

According to the amended complaint, Arab Bank—one of the largest financial institutions in the Middle East, with branches and subsidiaries in more than twenty-five countries, including a New York branch that provides clearing and correspondent banking services to foreign financial institutions—deliberately helped the terrorist organizations and their proxies to raise funds for attacks and make payments to the families of "martyrs." The plaintiffs further allege that Arab Bank used some of those facilities—the New York branch among them—to support the terrorist organizations in three ways. *See id.* at 261-62.

First, Arab Bank allegedly maintained accounts that the terrorist organizations used to solicit funds directly. The plaintiffs allege, with respect to HAMAS specifically, that Arab Bank "collected" funds into HAMAS accounts in its Beirut, Lebanon, and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch, and because there were various advertisements publicized throughout the Middle East calling

for donations to Arab Bank accounts. According to the plaintiffs, Arab Bank knew that the donations were being collected for terrorist attacks. *See id*. at 262.

Second, Arab Bank allegedly maintained accounts that proxy organizations and individuals used to raise funds for the terrorist organizations. For example, according to the amended complaint, Arab Bank maintained accounts, solicited and collected donations, and laundered funds for some of the purported charitable organizations that acted as fronts for the terrorist organizations. Arab Bank also maintained accounts for individual supporters of terrorist organizations such as HAMAS and al Qaeda. Again, responsible officials at Arab Bank purportedly knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. *See id.*

Third, Arab Bank allegedly played an active role in identifying the families of "martyrs" and facilitating payments to them from the Saudi Committee's "Account 98" funds, on behalf of the terrorist organizations. According to the plaintiffs, Arab Bank first worked with the Saudi Committee and HAMAS to finalize lists of eligible beneficiaries. Arab Bank then created individual bank accounts for the beneficiaries and facilitated transfers of "Account 98" funds into

those accounts, often routing the transfers through its New York branch in order to convert Saudi currency into Israeli currency. Once the accounts were filled, Arab Bank provided instructions to the public on how to qualify for and collect the money, and made payments to beneficiaries with appropriate documentation. *See id.* at 262-63.

The plaintiffs allege that Arab Bank's involvement with the terrorist organizations—particularly its facilitation of payments to the families of "martyrs"—incentivized and encouraged suicide bombings and other murderous acts that harmed the plaintiffs. *See id.* at 263.

**II.    Procedural History**

The plaintiffs in the consolidated cases filed five separate lawsuits between 2004 and 2010 in the United States District Court for the Eastern District of New York against Arab Bank alleging variations on the theme of the foregoing facts. *See Almog*, 04-CV-5564 (E.D.N.Y. filed Dec. 21, 2004); *Afriat-Kurtzer*, 05-CV-0388 (E.D.N.Y. filed Jan. 21, 2005); *Jesner*, 06-CV-3869 (E.D.N.Y. filed Aug. 9, 2006); *Lev*, 08-CV-3251 (E.D.N.Y. filed Aug. 11, 2008); *Agurenko, PLC*, 10-CV-0626 (E.D.N.Y. filed Feb. 11, 2010). All five lawsuits included tort claims under the ATS. At the

district court level, these cases were consolidated, along with six others, for discovery and pre-trial proceedings.[12]

On August 23, 2013, the district court dismissed the plaintiffs' ATS claims on the basis of *Kiobel I. Jesner v. Arab Bank*, 06-CV-3869, Unnumbered Dkt. Entry on Aug. 23, 2013. At the time, ATS claims were the only ones remaining in three of the five cases before the district court: *Jesner*, *Lev*, and *Agurenko*. Final judgments were therefore filed in each of those cases on August 28, 2013. The two remaining actions, *Almog* and *Afriat-Kurtzer*, involved both ATS claims and ATA claims, the latter of which remained intact after the district court's August 23, 2013 order. As a result, partial final judgments as to the ATS claims were issued in those cases on October 16, 2013.

The plaintiffs in all five cases appealed to this Court from the judgments on the pleadings regarding their ATS claims. On December 10, 2013, the plaintiffs collectively moved to consolidate the appeals. We granted that motion on January 6, 2014.

---

[12] The six other cases were *Linde v. Arab Bank, PLC*, No. 04-CV-2799 (E.D.N.Y. filed July 2, 2004); *Litle v. Arab Bank, PLC*, No. 04-CV-5449 (E.D.N.Y. filed Dec. 15, 2004); *Coulter v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y. filed Jan. 21, 2005); *Bennett v. Arab Bank, PLC*, No. 05-CV-3183 (E.D.N.Y. filed July 1, 2005); *Roth v. Arab Bank, PLC*, No. 05-CV-3738 (E.D.N.Y. filed Aug. 5, 2005); and *Weiss v. Arab Bank, PLC*, No. 06-Cv-1623 (E.D.N.Y. filed Apr. 7, 2006).

13

For the following reasons, we affirm the judgments of the district court.

## DISCUSSION

### I.    Standard of Review

"We review *de novo* a district court's decision to grant a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  In doing so, we "employ[] the same . . . standard applicable to dismissals pursuant to [Federal Rule of Civil Procedure] 12(b)(6)." *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (quotation marks omitted).  Thus, we "accept[] as true factual allegations made in the complaint, and draw[] all reasonable inferences in favor of the plaintiffs." *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### II.    Corporate Liability Under the Alien Tort Statute

We conclude that *Kiobel I* is and remains the law of this Circuit, notwithstanding the Supreme Court's decision in *Kiobel II* affirming this Court's judgment on other grounds.  We affirm the decision of the district court on that basis.  We do so despite our view that *Kiobel II* suggests that the ATS may allow

14

for corporate liability and our observation that there is a growing consensus among our sister circuits to that effect. Indeed, on the issue of corporate liability under the ATS, *Kiobel I* now appears to swim alone against the tide.

*A. The Decisions in* Kiobel I *and* Kiobel II

To repeat: The ATS provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In *Kiobel I*, the panel divided over the breadth of liability recognized by the "law of nations"—and, consequently, on whether corporations may be held liable under the ATS.

The majority opinion, written by Judge Cabranes and joined by then-Chief Judge Jacobs, concluded that the ATS does not permit claims against corporations because "[n]o corporation has ever been subject to *any* form of liability (whether civil, criminal, or otherwise) under the customary international law of human rights." 621 F.3d at 148 (emphasis in original). This conclusion was based on the majority's view that the law of nations must affirmatively extend liability to "a particular class of defendant, such as corporations," before that class of defendant may be held liable for conduct that violates a substantive norm of customary international law. *Id.* at 127. As precedential support for that

15

view, the majority cited footnote 20 in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). In *Sosa*, commenting on the portion of the opinion that instructed "federal courts . . . not [to] recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted," *id.* at 732, the Supreme Court stated that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual," *id.* at 732 n.20.

Judge Leval, *Kiobel I*'s third panel member, filed an opinion concurring in the judgment for the defendant, but sharply contesting the majority's conception of liability under the law of nations. He described "[i]nternational law, at least as it pertains to human rights," as "a sparse body of norms . . . prohibiting conduct," which lacks comprehensive rules regarding liability and so "leaves the manner of enforcement . . . almost entirely to individual nations." 621 F.3d at 152 (Leval, J., concurring). Judge Leval argued that *Sosa*'s footnote 20 is consistent with that view inasmuch as it does no more than caution courts to defer to the law of

nations on the scope of liability in those exceptional cases where customary

international law affirmatively bars recovery against private actors:

> If the violated norm is one that international law applies only against States, then a private actor, such as a corporation or an individual, who acts independently of a State, can have no liability for violation of the law of nations because there has been no violation of the law of nations. On the other hand, if the conduct is of the type classified as a violation of the norms of international law regardless of whether done by a State or a private actor, then a private actor, such as a corporation or an individual, has violated the law of nations and is subject to liability in a suit under the ATS. The majority's partial quotation out of context, interpreting the Supreme Court as distinguishing between individuals and corporations, misunderstands the meaning of the passage.

*Id.* at 165 (quotation marks and emphases omitted). Under that view, the ATS

does not prohibit corporate liability per se. Instead, if unspecified by the

international law in question, the scope of liability under the ATS is

appropriately classified as a question of remedy to be settled under domestic

law. *See id.* at 152.

The plaintiffs in *Kiobel I* obtained a writ of certiorari from the United States

Supreme Court. In its eventual opinion on the merits, the Supreme Court

described the case's rather arduous path to and before it:

> The [United States District Court for the Southern District of New York] dismissed [several ATS] claims, reasoning that the facts alleged to support those claims did not give rise to a violation of the

law of nations. The court denied respondents' motion to dismiss with respect to the remaining claims, but certified its order for interlocutory appeal [to the Second Circuit] pursuant to § 1292(b).

The Second Circuit dismissed the entire complaint, reasoning that the law of nations does not recognize corporate liability. 621 F.3d 111 (2010). We granted certiorari to consider that question. 565 U.S. ___, 132 S. Ct. 472 (2011). After oral argument, we directed the parties to file supplemental briefs addressing an additional question: "Whether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." 565 U.S. ___, 132 S. Ct. 1738 (2012). We heard oral argument again and now affirm the judgment below, based on our answer to the second question.

*Kiobel II*, 133 S. Ct. at 1663 (citations omitted in part).[13]

Thus, the Supreme Court first agreed to review the judgment of this Court. After being supplied with briefing and conducting oral argument directed to the analysis we had employed in *Kiobel I*, the Court decided to address a different issue. The Court concluded not that *Kiobel I* was right on the law, but that it was right in its conclusion because of the presumption against extraterritoriality. The Court observed that "all the relevant conduct took place outside the United States," which justified dismissal of the plaintiffs' ATS claims. *Id.* at 1669.

---

[13] The nature of the plaintiffs' several ATS claims that the district court dismissed is not relevant to this appeal.

   *B.  The Impact of* Kiobel II *on* Kiobel I

Although the route the Supreme Court took to its decision in *Kiobel II* seems to suggest that the Court was less than satisfied with our approach to jurisdiction over the cases on appeal under the ATS, it neither said as much nor purported to overrule *Kiobel I.*   The two decisions adopted different bases for dismissal for lack of subject-matter jurisdiction.  Whatever the tension between them, the decisions are not logically inconsistent.

The Supreme Court chose to affirm *Kiobel I* on extraterritoriality grounds without reaching the corporate liability question.  *Id.* at 1663.  But because both of these questions concern the proper interpretation of the ATS itself, and because the ATS is strictly jurisdictional,[14] it follows that both of these questions are jurisdictional.  Regarding corporate liability, *Kiobel I* held that federal courts lack jurisdiction over ATS suits against corporations; as to extraterritoriality, *Kiobel II* held that federal courts lack jurisdiction over ATS suits based solely on extraterritorial conduct unless that conduct sufficiently touches and concerns the

---

[14] The ATS is a "strictly jurisdictional" statute.  *Kiobel II*, 133 S. Ct. at 1664 (quoting *Sosa*, 542 U.S. at 713).  It "does not directly regulate conduct or afford relief.  It instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law."  *Id.*

territory of the United States.[15]  Taken together, they require that if *either* the defendant in an ATS suit is a corporation, *or* the ATS suit is premised on conduct outside the United States that does not sufficiently touch and concern the territory of the United States, *or both*, the federal court in which the suit was brought lacks jurisdiction.[16]

---

[15] The plaintiffs argue that by reaching the issue of extraterritoriality in *Kiobel II*, the Supreme Court implicitly acknowledged that it "possessed subject matter jurisdiction over an ATS claim against a corporate defendant."  Plaintiffs' Br. at 23.  That is, the plaintiffs contend that corporate liability is a jurisdictional question, whereas extraterritoriality is a merits question.  Therefore, they argue, because "subject-matter jurisdiction necessarily precedes a ruling on the merits," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), by reaching the issue of extraterritoriality, the Supreme Court implied that federal courts have jurisdiction over ATS claims against corporate defendants.  In support of this position, the plaintiffs cite the Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), which held that in a § 10(b) action under the Securities Exchange Act of 1934, the question of the extraterritorial application of the provision is "a merits question," *id.* at 254.  But this conclusion rests on an interpretation of § 10(b), which is not a jurisdictional statute, as is the ATS.  In *Kiobel II*, the Supreme Court specifically stated that the "principles underlying the presumption against extraterritoriality . . .  constrain courts *exercising their power* under the ATS."  133 S. Ct. at 1665 (emphasis added).  "Subject-matter jurisdiction . . . refers to a tribunal's power to hear a case."  *Morrison*, 561 U.S. at 254 (quotation marks omitted).  *Kiobel II* thus addressed a jurisdictional question, and did not reach the merits of plaintiffs' ATS claim.

[16] In *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court held that due process does not permit the exercise of general personal jurisdiction under California's long-arm statute over a German corporation that the plaintiffs had sued under the ATS, the Torture Victim Protection Act of 1991, California law, and Argentina law, *id.* at 758-63.  The Court also noted that the plaintiffs' ATS claims were "infirm" in light of *Kiobel II*'s holding that the presumption against extraterritorial application controls claims under the ATS.  *Id.* at 762-63.  Neither the Supreme Court's holding as to personal jurisdiction nor its statement about the viability of the plaintiffs' ATS claims implies that

Generally speaking, "this panel is bound by prior decisions of this court unless and until the precedents established therein are reversed *en banc* or by the Supreme Court." *United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009); *see also, e.g., Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) (similar). We have recognized, though, that there is an exception to this general rule when an "intervening Supreme Court decision . . . casts doubt on our controlling precedent." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007) (quotation marks omitted).[17]

---

corporate liability is or is not possible under the ATS. As to the former, the Supreme Court need not have asserted subject-matter jurisdiction over the plaintiffs' ATS claims before reaching the issue of personal jurisdiction, as the plaintiffs' ATS claims were "infirm," meaning that the court lacked subject matter jurisdiction over them, and there were several non-ATS claims at issue over which the court could properly exercise subject matter jurisdiction. As to the latter, as explained above, extraterritoriality and a defendant's corporate nature are (in the Second Circuit) distinct, if often overlapping, bases for dismissal under the ATS.

[17] The full quotation reads:

> While as a general rule, one panel of this Court cannot overrule a prior decision of another panel[,] . . . an exception to this general rule arises where there has been an intervening Supreme Court decision that casts doubt on our controlling precedent. Moreover, the intervening decision need not address the precise issue already decided by our Court. We agree with the District Court that our holding in [our earlier case] was based on an interpretation of the Social Security Act's antiattachment provision that is inconsistent with the Supreme Court's reading of [the statutory provision at issue in a later case]. We therefore conclude that (1) [our prior opinion]'s holding concerning the scope of [the statutory provision at issue] is no longer good law and (2) under [the Supreme Court's opinion], New York's income-first policy as applied to Social Security benefits does not violate [the provision].

"[F]or this exception to apply, the intervening decision need not address the precise issue already decided by our Court." *Union of Needletrades, Indus. & Textile Empls., AFL-CIO, CLC v. U.S. I.N.S.*, 336 F.3d 200, 210 (2d Cir. 2003). Instead, there must be a conflict, incompatibility, or "inconsisten[cy]" between this Circuit's precedent and the intervening Supreme Court decision. *Wojchowski*, 498 F.3d at 109. The effect of intervening precedent may be "subtle," but if the impact is nonetheless "fundamental," it requires this Court to conclude that a decision of a panel of this Court is "no longer good law." *Id.* (quotation marks and alteration omitted).

Kiobel II* does cast a shadow on *Kiobel I* in several ways.[18]

First, in *Kiobel II*, the Supreme Court stated that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices" to displace the presumption against extraterritorial application. 133 S. Ct. at 1669. The implication of a statement that *mere* corporate presence is insufficient would seem to be that corporate presence may, in

---

*Wojchowski*, 498 F.3d at 106 (citations and quotation marks omitted).

[18] As noted above, the route the Supreme Court took to its decision in *Kiobel II* itself seems to suggest that the Court was less than satisfied with our approach to jurisdiction under the ATS in *Kiobel I*.

combination with some other factual allegations, be sufficient—so jurisdiction over ATS suits against corporations is sometimes proper. Indeed, if corporate liability under the ATS were not possible as a general matter, the Supreme Court's statement about "mere corporate presence" would seem meaningless. Accordingly, *Kiobel II* appears to suggest that the ATS allows for some degree of corporate liability.

Second, *Kiobel II* embraced an interpretation of *Sosa* that seems to us to be more consistent with Judge Leval's *Kiobel I* concurrence than the majority opinion. According to the Supreme Court, "[t]he question under *Sosa*" is "whether [a federal] court has authority to recognize a cause of action *under U.S. law* to enforce a norm of international law." *Kiobel II*, 133 S. Ct. at 1666 (emphasis added). The Supreme Court further stated that the ATS empowers federal courts to recognize such a cause of action "under federal common law" to enable litigants to bring "private claims" based on "international law violations." *Id.* at 1663 (quoting *Sosa*, 542 U.S. at 724, 732). *Kiobel II* thus appears to reinforce Judge Leval's reading of *Sosa*, which derives from international law only the conduct proscribed, leaving domestic law to govern the available remedy and,

23

presumably, the nature of the party against whom it may be obtained.[19]  If that is so, *Kiobel II* suggests that *Kiobel I* relies in part on a misreading of *Sosa*.[20]

Third, *Kiobel I* and *Kiobel II* may work in tandem to narrow federal courts' jurisdiction under the ATS more than what we understand Congress may have intended in passing the statute.  As Justice Breyer noted in his *Kiobel II* concurrence, the basic purpose of the ATS is to provide compensation to foreign plaintiffs injured by "pirates," "torturers," "perpetrators of genocide," and similar actors.  *Kiobel II*, 133 S. Ct. at 1672-75 (Breyer, *J.*, concurring in the judgment).  Together, *Kiobel I* and *Kiobel II* put such aggrieved potential plaintiffs in a very small box:  The two decisions read cumulatively provide that plaintiffs can bring ATS suits against only natural persons, and perhaps non-corporate entities, based on conduct that occurs at least in part within (or otherwise sufficiently touches and concerns) the territory of the United States.  At a time when large

---

[19] We acknowledge that in some instances the conduct proscribed may also specifically identify the entities or individuals so proscribed.

[20] Lending further support to this conclusion, the *Kiobel I* majority's interpretation of *Sosa* relied in part on Judge Katzmann's concurrence in *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007).  *Kiobel I*, 621 F.3d at 129-31.  Judge Katzmann, however, saw "no inconsistency between the reasoning of [his] opinion in *Khulumani* and Judge Leval's well-articulated conclusion . . . that corporations, like natural persons, may be liable for violations of the law of nations under the AT[S]." *Kiobel v. Royal Dutch Petroleum Co.*, 642 F.3d 379, 380-81 (2d Cir. 2011) (Katzmann, J., dissenting from denial of rehearing en banc).

corporations are often among the more important actors on the world stage,[21] and where actions and their effects frequently cross international frontiers, *Kiobel I* and *Kiobel II* may work together to prevent foreign plaintiffs from having their day in court in a far greater proportion of tort cases than Congress envisioned when, centuries ago, it passed the ATS.

Our reading of *Kiobel II* is bolstered by what appears to be a growing consensus among our sister circuits that the ATS allows for corporate liability. To date, the other circuits to have considered the issue have all determined that corporate liability is possible under the ATS. *See Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022 (9th Cir. 2014); *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Flomo v.*

---

[21] Indeed, some corporations, such as the defendant Arab Bank, are important enough that their home countries' governments are acutely concerned about their financial well-being and exposure to lawsuits. In this regard, we acknowledge the Kingdom of Jordan's argument in its *amicus* brief that "[t]he ATS was enacted to enhance respect for foreign nations' sovereign dignity," and that foreign nations may have a strong "sovereign interest in protecting [their] corporations from being improperly haled into U.S. courts." *Amicus Curiae* Brief of the Hashemite Kingdom of Jordan at 7 (emphasis removed). But while the imposition of liability on certain foreign corporations under the ATS could of course raise foreign policy concerns, these concerns are substantially mitigated by the presumption against the extraterritorial application of the ATS, the doctrine of sovereign immunity (under which foreign corporations may be held to be organs of a foreign state), and the possibility of action by the executive or legislative branches, each of which may serve as a counterweight to the imposition of corporate liability in ATS suits.

*Firestone Nat. Rubber Co.*, 643 F.3d 1013, 1021 (7th Cir. 2011*); Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *see also Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 530-31 (4th Cir. 2014) (holding that the district court erred in concluding that it lacked subject matter jurisdiction over an ATS claim against a corporate defendant on extraterritoriality grounds, and finding that the plaintiffs' ATS claims sufficiently "'touch[ed] and concern[ed]' the territory of the United States" based on, *inter alia*, the corporate defendant's "status as a United States corporation"); *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 163 (5th Cir. 1999) (dismissing ATS claims against corporate defendants under Rule 12(b)(6), and to that extent appearing to implicitly assume jurisdiction over ATS claims against corporate defendants).

For those reasons, *Kiobel II* may be viewed as an "intervening Supreme Court decision that casts doubt on [*Kiobel I*]," *Wojchowski*, 498 F.3d at 106 (quotation marks omitted), even though it does not "address the precise issue" of corporate liability, *Union of Needletrades*, 336 F.3d at 210. *Kiobel II* suggests a reading of the ATS that is at best "inconsistent" with *Kiobel I*'s core holding, which along with the views of our sister circuits indicates that something may be wrong with *Kiobel I*.

We nonetheless decline to conclude that *Kiobel II* overruled *Kiobel I*. We think that one panel's overruling of the holding of a case decided by a previous panel is perilous. It tends, in our view, to degrade the expectation of litigants, who routinely rely on the authoritative stature of the Court's panel opinions. It also diminishes respect for the authority of three-judge panel decisions and opinions by which the overwhelming majority of our work, and that of other circuits, is accomplished. *See* 13 Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 3506 (3d ed. 1998) (noting that "[t]he courts of appeals generally follow the practice that one panel is bound by the previous decision of another panel of that court," and collecting cases).[22] We will leave it to either an en banc sitting of this Court or an eventual Supreme Court review to overrule *Kiobel I* if, indeed, it is no longer viable. *Cf. Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 108-10 (2d Cir. 2010) (applying a prior

---

[22] We also note post-*Kiobel II* comments in *dicta* of this Court that *Kiobel I* remains authoritative in this Circuit. *See Balintulo v. Ford Motor Co.*, 796 F.3d 160, 166 n.28 (2d Cir. 2015); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 n.5 (2d Cir. 2014); *Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 49 n.6 (2d Cir. 2014); *Balintulo v. Daimler* AG, 727 F.3d 174, 191 n.26 (2d Cir. 2013); *but see Chowdhury*, 746 F.3d at 55 (Pooler, J., concurring) (writing separately "for the sole purpose of emphasizing the narrowness of this Court's disposition with respect to the implications of [*Kiobel II*]," which is "tied to considerations regarding which claims do not 'touch and concern the territory of the United States,'" and not whether the ATS permits corporate liability (quoting *Kiobel II*, 133 S. Ct. at 1669)).

panel's decision while explicitly disagreeing with it and proffering "several reasons why this case might be appropriate for reexamination by our full Court").[23]

If this Court declines to overrule *Kiobel I* (either on the merits or by refusing to proceed en banc), the Supreme Court would, of course, be able to do so should it choose to hear the case. The Supreme Court granted certiorari on this issue in 2011 when it first decided to hear an appeal from *Kiobel I*. *Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 472 (2011). Having nonetheless avoided addressing the issue directly in *Kiobel II*, perhaps it would decide to grant certiorari on this issue again—especially in light of the divergence of federal case law since.

Finally, the district court dismissed the plaintiffs' ATS claims solely on corporate liability grounds under *Kiobel I*. It is well settled that "we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." *Olsen v. Pratt &*

---

[23] This Court declined to rehear the matter en banc, but the *Arkansas Carpenters* panel's position was later largely vindicated by the Supreme Court. *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) (abrogating the holding of this Court that the *Arkansas Carpenters* panel had criticized, as stated in *Louisiana Wholesale Drug Co. v. Shire LLC (In re Adderall XR Antitrust Litigation)*, 754 F.3d 128, 132-33 (2d Cir. 2014)).

*Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 275 (2d Cir. 1998) (quoting *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 68 (2d Cir. 1991)); *see also N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 222 n.4 (2d Cir. 2014) (same, citing *Olsen*).  However, we have discretion to choose not to do so based on prudential factors and concerns.  *See Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012) ("While generally we decline considering arguments not addressed by the district court, this is a prudential rule we apply at our discretion.  In determining whether to consider such issues, we rely on a number of factors, including the interests of judicial economy, and whether the unaddressed issues present pure questions of law." (citations omitted)).

It is tempting to seek to avoid grappling with issues requiring an analysis of the relationship between *Kiobel I* and *Kiobel II* and the continuing viability of *Kiobel I* simply by affirming the district court's judgments on the basis of *Kiobel II* alone.  We nevertheless decline to do so for several reasons.  First, inasmuch as the district court did decide the case based solely on a mechanical application of *Kiobel I*, if it is "good law," an affirmance on the basis of *Kiobel I* is the simplest, most direct route to that result.  By contrast, in order to affirm on the grounds that law established by *Kiobel II* prohibits the assumption of jurisdiction in this

case, we would have to decide in the first instance that the alleged activities underlying the plaintiffs' claims do not touch and concern the United States sufficiently to justify a conclusion that the district court had subject matter jurisdiction under *Kiobel II*'s extraterritoriality test. It seems to us to be unwise to decide the difficult and sensitive issue of whether the clearing of foreign dollar-denominated payments through a branch in New York could, under these circumstances, displace the presumption against the extraterritorial application of the ATS, when it was not the focus of either the district court's decision or the briefing on appeal. *See, e.g., Amicus Curiae* Brief of the Institute of International Bankers at 5-20 (discussing several concerns regarding whether the clearing of foreign dollar-denominated transfers through the United States would be sufficient domestic conduct to allow suit under the ATS).

Moreover, deciding this appeal solely on the basis of *Kiobel I* may well further the development of the law of this Circuit in this regard. If *Kiobel I* remains authoritative, litigants would benefit from the settling of expectations that clarification would bring. And if the rule of *Kiobel I* does not prevail, then leaving it unnecessarily "on the books" is worrisome—it may result in the dismissal of cases that are meritorious, including possibly multidistrict litigations

that are randomly assigned to the district courts in this Circuit. Perhaps more insidiously, plaintiffs with ATS claims against corporations that turn out to be permissible might well be dissuaded from asserting them in this Circuit despite their ultimate merit.

We therefore affirm on the basis of the holding of *Kiobel I*.

### III.    Common Law Claims

The plaintiffs request that if we affirm the dismissal of their ATS claims—as indeed we do—we reinstate the "general federal common law" claims asserted in their complaints (to which they refer on appeal as their "general common-law tort" claims), which the district court dismissed as redundant and lacking a "sound basis." *Almog*, 471 F. Supp. 2d at 294. Alternatively, the plaintiffs request leave to amend their complaints in order to re-plead under state or foreign law the claims that they originally pleaded under federal common law. We decline both requests.

First, we will not reinstate the plaintiffs' federal[24] common-law causes of action because we discern no basis for such nebulous, non-statutory claims under

---

[24] The plaintiffs clearly asserted their non-statutory claims under federal law, not state law. Indeed, their complaints allege that they were injured in violation of "general federal common law." *Almog*, No. 04-CV-5564 Dkt. Nos. 7 ¶ 4, 1250 ¶ 101; *Afriat-*

federal law.[25] *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 172 (2d Cir. 2014) (concluding that if a plaintiff's "assertion of nonstatutory wrongs describes traditional types of torts by private entities," the plaintiff's claims arise "under state law rather than federal common law," unless the plaintiff can identify a "uniquely federal interest in the rules of decision to be applied," or a "conflict between a federal policy or interest and the use of state law").

As for leave to amend the complaints, "we review [the district court's refusal to allow such amendment] only for abuse of discretion which ordinarily we will not identify absent an error of law, a clearly erroneous assessment of the facts, or a decision outside the available range of permitted choices." *Knife Rights,*

---

*Kurtzer*, No. 05-CV-0388 Dkt. No. 3 ¶ 4; *Jesner*, No. 06-CV-3869, Dkt. No. 336 ¶ 4; *Lev*, No. 08-CV-3251, Dkt No. 1 ¶ 4. (The complaint in *Agurenko* does not assert general federal common-law claims. *See* No. 10-CV-0626, Dkt. No. 1.) And in their briefing on the motion to dismiss at issue on this appeal, they specifically requested the opportunity to "convert" their common-law claims "to non-federal law claims" in order to assert "corollary non-federal theories based on the same facts." *Jesner*, No. 06-CV-3869, Dkt No. 735 at 24-25.

[25] The defendant argues that the plaintiffs' general federal common-law claims are barred by *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This argument rests on a common misunderstanding of *Erie*, which merely stands for the proposition that when an issue is governed by state law, federal courts must look to the decisions of that state's courts, not to federal court decisions purporting either to interpret the state law or provide better answers. *See id.* at 78-80. "*Erie* did not in any way involve the question of whether the federal courts possess common law powers to use in other areas of law whose interpretation was entrusted primarily to them." Pierre N. Leval, *Distant Genocides*, 38 Yale J. Int'l L. 231, 243 (2013); *see also generally* Henry J. Friendly, *In Praise of* Erie—*And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 405-22 (1964).

*Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (citations omitted). While "[l]eave to amend should be freely granted, . . . the district court has the discretion to deny leave if there [was] a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

The plaintiffs have spent more than ten years litigating the matters before us but have not specified any particular state or foreign common-law theory on which they seek to recover. To be sure, they have in their complaints and in their briefing on appeal asserted that they may recover under general principles of joint-venture liability, agency, reckless disregard, intentional injury of others by a third party, reckless disregard, wrongful death, survival, and negligent or intentional infliction of emotional distress. But their short and conclusory statements to this effect, untethered to the law of any particular jurisdiction or any serious attempt at explanation, did not put the defendant on notice of specific state or foreign common-law claims that it might be called upon to defend against in this litigation.[26] The plaintiffs have had ample time to develop

---

[26] The complaint in *Almog* sets forth five counts for "assisting in the intentional injury of others by a third party" (Count Six), "reckless disregard" (Count Seven), "wrongful death" (Count Eight), "survival" (Count Nine), and "negligent and/or intentional

and assert such theories. The district court did not abuse its discretion in denying leave to amend because permitting the plaintiffs to repackage their federal common-law claims as state or foreign common-law claims at such a late stage would, we think, do a disservice both to the courts in which they chose to litigate their claims, and to the defendant, which must prepare itself to defend against them.

Permitting the plaintiffs in *Jesner*, *Lev*, and *Agurenko* to amend their complaints would, moreover, have been futile. Following the dismissal of the plaintiffs' ATS claims, the only basis on which the district court might exercise jurisdiction over these actions would be diversity of citizenship. But "diversity is lacking . . . where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens." *Universal Licensing Corp. v. Paola del Lungo S.P.A.*, 293 F.3d 579, 581 (2d Cir. 2002). Here, there are aliens on both sides of the litigation—plaintiffs are aliens (only aliens can bring ATS claims), and so is the defendant, a citizen of Jordan—and the

---

infliction of emotional distress" (Count Ten). *Almog*, No. 04-CV-5564, Dkt. Nos. 7 ¶¶ 329-54, 1250 ¶ 101. It is unclear whether these claims are among the *Almog* plaintiffs' general federal common-law claims. Their complaint asserted causes of action based only on "the laws of nations, United States' [sic] statutes, and general federal common law," *Almog*, No. 04-CV-5564, Dkt. No. 7 ¶ 4, and the counts do not specify under which jurisdiction's law they seek to recover.

*Jesner*, *Lev*, and *Agurenko* plaintiffs do not seek to assert any other federal claims that might provide a basis for federal-question jurisdiction. For these reasons, permitting the *Jesner*, *Lev*, and *Agurenko* plaintiffs to amend their complaints to assert non-federal common-law claims would be fruitless.

The district court therefore acted within its discretion in declining to permit the plaintiffs to amend their complaints.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of the district court.