*Glob. Reins. Corp. of Am. v. Century Indem. Co.*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2020
No. 20-1476

**GLOBAL REINSURANCE CORPORATION OF AMERICA,**
SUCCESSOR IN INTEREST TO CONSTITUTION REINSURANCE,
CORPORATION,
*Plaintiff-Counter-Defendant-Appellant,*

v.

**CENTURY INDEMNITY COMPANY,**
SUCCESSOR IN INTEREST TO CCI INSURANCE COMPANY,
SUCCESSOR IN INTEREST TO INSURANCE COMPANY OF NORTH AMERICA,
*Defendant-Counter-Claimant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: JUNE 3, 2021
DECIDED: DECEMBER 28, 2021

Before:     CALABRESI, POOLER, and MENASHI, *Circuit Judges.*

Global Reinsurance Corporation of America appeals from the judgment of the U.S. District Court for the Southern District of New York (Schofield, J.) denying its request for a declaratory judgment. Global issued ten facultative reinsurance certificates to Century Indemnity Company, pursuant to which Global agreed to indemnify Century for losses and litigation expenses that Century might incur in connection with the liability policies it had issued to Caterpillar Tractor Company. After Caterpillar incurred losses and expenses, it received insurance payments from Century. Century then sought reinsurance payments from Global. When Century billed Global, however, Global sought a judicial declaration that the policy limits of the reinsurance certificates capped Global's reinsurance obligations with respect to both losses and expenses. The district court rejected this view. It held that litigation costs were not subject to the policy limits because the certificates contained a follow-form provision that incorporates into the certificates the terms and conditions of the underlying Century policies, which made defense costs payable in addition to the policies' limits. We affirm this judgment and hold that the certificates' policy limits are not inclusive of defense costs. In so holding, we recognize that our prior decisions in *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir. 1990), and *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993), which concerned matters of New York law, have been undermined by an intervening decision of the New York Court of Appeals and no longer constitute the law of our circuit.

SEAN THOMAS KEELY (John M. O'Bryan, *on the brief*), Freeborn & Peters LLP, New York, NY, *for Plaintiff-Counter-Defendant-Appellant*.

JONATHAN D. HACKER, O'Melveny & Myers LLP, Washington, D.C. (Anton Metlitsky, O'Melveny & Myers LLP, New York, NY; Daryn Earl Rush, White and Williams LLP, Philadelphia, PA, *on the brief*), *for Defendant-Counter-Claimant-Appellee*.

Steven C. Schwartz, Karen C. Baswell, Chaffetz Lindsey LLP, New York, NY, *for amici curiae Aon Benfield U.S., Guy Carpenter & Company, LLC, and Willis Re Inc.*

MENASHI, *Circuit Judge*:

Plaintiff-Counter-Defendant-Appellant Global Reinsurance Corporation of America appeals from the judgment of the U.S. District Court for the Southern District of New York (Schofield, J.) denying Global's request for a declaratory judgment.

Global issued ten facultative reinsurance certificates to Defendant-Counter-Claimant-Appellee Century Indemnity Company, pursuant to which Global agreed to indemnify Century for losses and litigation expenses Century might incur in connection with commercial liability policies Century had issued to Caterpillar Tractor

Company. [1] After Caterpillar incurred losses and expenses, it received insurance payments from Century. Century then sought reinsurance payments from Global. When Century billed Global, however, Global sought a judicial declaration that the policy limits of the reinsurance certificates capped Global's reinsurance obligations with respect to both losses and defense costs. Century contended that the policy limits applied only to indemnity losses and that Century's litigation costs were payable in addition to the policy limits.

Applying our decisions in *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir. 1990), and *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993), the district court ruled for Global, holding that the policy limits imposed a cap on Global's liability with respect to both losses and defense costs. Century appealed this decision, arguing that Global's reinsurance certificates did not cap payments related to litigation expenses. This was so, Century argued, because the reinsurance certificates were written to be "concurrent with," or the same as, the policies Century had issued to Caterpillar, under which Century's obligation to pay for Caterpillar's defense against covered claims was not subject to the policies' liability limits. Century argued that concurrency was not only expressed in the language of the certificates but also fundamental to the reinsurance market itself and that our court erred in *Bellefonte* and *Unigard* by disregarding this crucial principle.

---

[1] For clarity, this opinion refers to the current parties-in-interest, Global Reinsurance Corporation of America and Century Indemnity Company, rather than to their predecessors-in-interest.

We thought this argument merited further consideration and therefore asked the New York Court of Appeals by means of a certified question whether New York law imposed a rule of construction or a strong presumption that a reinsurance certificate's liability limit caps the reinsurer's liability with respect to both indemnity losses and defense costs regardless of whether the underlying policy being reinsured is understood to cover defense costs in excess of the policy's liability limit. The Court of Appeals answered that New York law imposes no such rule of construction or presumption. Reinsurance contracts, the Court of Appeals explained, are subject to ordinary rules of contract interpretation. After receiving this answer, we remanded the case to the district court, instructing it to construe the reinsurance certificates according to the language of those certificates and the specific context of reinsurance.

On remand, the district court reversed its prior decision. It held that the reinsurance certificates do not cap Global's obligation to pay its proportionate share of Century's defense costs when Century suffers indemnity losses. The district court explained that concurrent treatment of defense costs was incorporated into the certificates through each certificate's "follow-form" clause, which made Global's reinsurance subject to the same terms and conditions of the underlying Century policies except as otherwise specifically provided. Finding that no provision specifically provided for non-concurrent treatment of defense costs and that the testimony of Century's expert witnesses as to the presumption of concurrency in the reinsurance market was credible, the district court denied Global's request for declaratory relief. Global appeals from that judgment.

5

Applying ordinary rules of contract interpretation, we agree with the district court: the reinsurance certificates' follow-form clauses require Global to pay its proportionate share of Century's defense costs in excess of the certificates' liability limits. We base this conclusion on the certificates' unambiguous language as well as the testimony of Century's experts confirming that a strong presumption of concurrency prevailed in the reinsurance market at the time the certificates were issued. To the extent that *Bellefonte* and *Unigard* suggest a different outcome, we conclude that those cases have been undermined by the decision of the New York Court of Appeals answering our certified question. For that reason, *Bellefonte* and *Unigard* no longer constitute the law of our circuit. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

### I

From 1962 to 1981, Century Indemnity Company issued liability insurance policies to Caterpillar Tractor Company. The policies obligated Century to indemnify Caterpillar for loss or damages resulting from third-party claims up to the stated liability limit for each policy. In addition to paying indemnity losses—that is, settlements and judgments—on covered claims, Century was also required under the policies to participate in Caterpillar's defense against claims or to help pay for the costs of Caterpillar's defense. Under the terms and conditions of the policies, Caterpillar's defense costs were payable in addition to the applicable limits on liability under the policies. In other words, Century's payments for

Caterpillar's litigation expenses did not count toward the policies' liability limits.[2]

Century decided to reinsure[3] the policies and accordingly executed facultative reinsurance certificates with Global Reinsurance Corporation of America. In a facultative reinsurance transaction, the company purchasing reinsurance—known as the "cedent"—sells, or "cedes," all or a portion of the risk under a single insurance policy to the reinsurance provider. The reinsurer has the ability, or "faculty," to accept or reject the risk of any given policy on an individual basis.[4] Under such agreements, the cedent pays the reinsurer a premium for assuming a portion of the risk under the policy being reinsured. Between 1971 and 1980, Global issued ten facultative certificates that reinsured policies Century had issued to Caterpillar.

The certificates begin with a preamble expressing Global's general promise to reinsure. For example, one certificate opens:

---

[2] Century's obligation to pay Caterpillar's defense costs ceased once Century's indemnity payments exhausted the policies' liability limits. *See* J. App'x 296 (Hall Statement ¶ 24).

[3] "Reinsurance is the insurance of one insurer (the 'reinsured') by another insurer (the 'reinsurer') by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public." *In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 89 N.Y.2d 94, 105-06 (1996) (internal quotation marks omitted).

[4] In contrast to facultative reinsurance, "treaty reinsurance" involves the transfer of a portion of the risk of numerous insurance policies issued to different policyholders covering an entire class of risk. In such transactions, the reinsurer is usually obligated to reinsure any policy that falls within the defined class of risk being reinsured.

> In consideration of the payment of the premium, and subject to the terms, conditions, and limits of liability set forth herein and in the Declarations made a part hereof, the Reinsurer [Global] does hereby reinsure the ceding company [Century] named in the Declarations (herein called the Company) in respect of the Company's policy(ies) as follows.

J. App'x 193. In another representative certificate, to which the parties refer as "Certificate X," the "Declarations" consist of five "Items" that outline Global's reinsurance obligations.[5] Item 1 provides that the "Type of Insurance" being reinsured is "Blanket General Liability, excluding Automobile Liability as original." J. App'x 168. Item 2 sets forth the "Policy Limits and Application," which is "$1,000,000 each occurrence as original." *Id.* Item 3 provides a "Company Retention" of "$500,000 of liability as shown in Item #2 above." *Id.* Item 4 specifies the "Reinsurance Accepted" by Global and provides that Global will reinsure "$250,000 part of $500,000 each occurrence as original excess of the Company's retention as shown in Item #3 above." *Id.* Finally, Item 5 identifies the "Basis" of coverage as "Excess of Loss." *Id.*

Taken together, the Declarations of Certificate X structure Global's reinsurance obligations as follows. For the first $500,000 of indemnity losses suffered by Century, Global has no liability. Those losses fall within the primary layer of coverage—the $500,000 retention—that Century did not reinsure. Once Century's indemnity

---

[5] The ten reinsurance certificates and the underlying policies do not use identical language, but the parties have stipulated that the differences in language between the certificates and policies are not material. *See* J. App'x 854 n.1. Accordingly, this opinion relies on the preamble quoted above and the language of Certificate X to establish the meaning of all of the certificates.

8

losses exceed the $500,000 retention, Global becomes obligated to pay "$250,000 part of $500,000," or 50 percent, of Century's losses for each "occurrence" covered by the policy, up to the policy limit of $1,000,000. The reinsurance thus provides an excess layer of coverage above the primary layer, with Century bearing 100 percent of the risk in the primary layer and Global bearing 50 percent of the risk in the excess layer. In exchange for taking on 50 percent of the risk in the excess layer, Century paid Global 50 percent of the net premium Century received on that layer. Century took out a separate reinsurance policy with another company for the remaining 50 percent of the risk in the excess layer, making the layer fully reinsured.

The reinsurance certificates each contain a standard "follow-form" or "follow-the-fortunes" clause, which incorporates into Global's reinsurance the terms and conditions of the Century policies. In Certificate X, the follow-form clause provides that "the liability of the Reinsurer specified in Item 4 above [the 'Reinsurance Accepted' provision] shall follow that of the Company and, except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of the Company's policy." *Id.* at 169. In industry parlance, this provision means that Global's reinsurance liability is "concurrent with," or the same as, Century's liability under the underlying policy. In addition to the follow-form clause, the certificates each contain a payments provision that explains how Global's reinsurance liability is calculated. In Certificate X, the payments provision provides that "[a]ll claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, who shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's

9

loss payment bears to the Company's gross loss payment, its proportion of expenses … incurred by the Company in the investigation and settlement of claims or suits." *Id.*

In the late 1980s, Caterpillar began to be sued for bodily injuries allegedly resulting from exposure to asbestos contained in Caterpillar products. Caterpillar sought coverage and defense for these claims through a successful declaratory judgment action it filed against Century in Illinois state court. *See Caterpillar, Inc., v. Century Indem. Co.*, No. 3-09-0456, 2011 WL 488935 (Ill. App. 3d Feb. 1, 2011). As a result of that judgment and related settlements, Century became obligated to indemnify Caterpillar for certain amounts Caterpillar had paid as damages to asbestos claimants and for costs Caterpillar had incurred to defend itself against covered claims. Century has since taken over the defense of asbestos claims against Caterpillar and continues to pay loss settlements and litigation expenses incurred in connection with those claims.

When Century's payments to Caterpillar exceeded the reinsurance certificates' retentions, Century began billing Global for its proportionate share of indemnity losses and defense costs. In each case that Century demanded payment, Global paid up to the dollar amount stated in the applicable "Reinsurance Accepted" provision but refused to pay any amounts—whether for indemnity or defense costs—that exceeded the dollar figures listed in those provisions. Global maintained that the dollar amount stated in each Reinsurance Accepted provision established a cap on its liability to Century with respect to both indemnity losses and defense costs. In Global's view, therefore, once its total payments to Century reached the amount listed in each Reinsurance Accepted provision, it had no further

10

obligation to indemnify Century. Global thus took the position that, unlike the underlying Century policies, its payments for Century's defense costs were subject to the liability limit set forth in each certificate. Century took the opposite position, arguing that the certificates were concurrent with the underlying policies with respect to the treatment of defense costs and that as a result those costs were payable in addition to the certificates' policy limits.

## II

Invoking federal diversity jurisdiction, Global commenced a lawsuit against Century in the U.S. District Court for the Southern District of New York. *See Glob. Reins. Corp. of Am. v. Century Indem. Co.* (*Global I*), No. 13-CV-6577, 2014 WL 4054260 (S.D.N.Y. Aug. 15, 2014). Global sought *inter alia* a declaratory judgment that the Reinsurance Accepted provision in each certificate capped the amount that Global was obligated to pay to Century for both indemnity losses and defense costs. *Id.* at *1. To analyze Global's claim, the district court consulted two of our precedents that construed similar provisions in reinsurance contracts: *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir. 1990), and *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993). *Global I*, 2014 WL 4054260, at *4-7.

In *Bellefonte*, the insurance provider Aetna issued primary and excess insurance policies to a medical device manufacturer that became liable to third parties for bodily injury claims. 903 F.2d at 911. A group of reinsurers had issued facultative certificates to Aetna that reinsured portions of the excess policies. *Id.* As with the policies at issue here, the certificates provided that the reinsurance was "subject to the terms, conditions and amount of liability set forth herein,"

11

which included a Reinsurance Accepted provision setting forth each reinsurer's liability. *Id.* The certificates also each contained a follow-form provision and a payments provision that are materially identical to those at issue in this case. *Compare id.*, *with* J. App'x 169.

In construing the reinsurance certificates, we held that "the limitation on liability" set forth in the Reinsurance Accepted provision "capped the reinsurers' liability under the certificates" such that "[a]ll other contractual language must be construed in light of that cap." *Bellefonte*, 903 F.2d at 914. We concluded that "the reinsurers' entire obligation is quantitatively limited by the dollar amount the reinsurers agreed to reinsure" and that "[o]nce the reinsurers have paid up to the certificate limits, they have no additional liability to Aetna for defense expenses or settlement contributions." *Id.* We rejected Aetna's argument that the follow-form clause and payments provision "in each reinsurance certificate[] exempts defense costs from the clauses limiting the reinsurers' overall liability under the certificates," holding instead that Aetna's defense costs were "'subject to' the express cap on liability set forth in each certificate." *Id.*

In *Unigard*, we again confronted a facultative reinsurance certificate providing that the reinsurer's obligations were "subject to the terms, conditions, *limits of liability*, and Certificate provisions set forth herein." 4 F.3d at 1071. The cedent argued that notwithstanding that provision, the reinsurer was obligated to pay defense costs in excess of the certificate's policy limit under the follow-form clause, which provided that the reinsurer's liability "*except as otherwise provided by this Certificate,* shall be subject in all respects to all the terms and conditions of [the underlying policy]." *Id.* at 1070-71. We rejected

12

this argument, explaining that "[t]he Certificate otherwise provides for the policy limits." *Id.* at 1071. Following *Bellefonte*'s instruction that "'[a]ll … contractual language must be construed in light of th[e] cap'" set forth in the policy limits, we concluded that the follow-form clause "did not 'override the limitation on liability' and that therefore the reinsurer was not liable for expenses in excess of the liability limit." *Id.* at 1070-71 (quoting *Bellefonte*, 903 F.2d at 913-14).

Faced with these precedents, the district court granted summary judgment to Global, noting that "the relevant language in the Certificates at issue is nearly identical to the language relied on by the Second Circuit in *Bellefonte*." *Global I*, 2014 WL 4054260, at *5. The district court also noted that "[s]tanding on its own, the unambiguous language in the 'Reinsurance Accepted' sections of the Certificates does not differentiate between reinsurance accepted for loss versus reinsurance accepted for expenses, but simply provides a total cap on liability." *Id.* at *6. And because "[t]he *Bellefonte* and *Unigard* courts made it clear that *all other contractual language* must be construed in light of the Certificate Limit," the district court concluded that "[t]he dollar amount indicated in each of the Certificate Limits is the maximum amount that Global can be obligated to pay for loss and expenses, combined." *Id.* at *5, *7 (internal quotation marks and alteration omitted). Following the district court's decision, Century moved for reconsideration, which the district court denied. *See Glob. Reins. Co. of Am. v. Century Indem. Co.* (*Global II*), No. 13-CV-6577, 2015 WL 1782206 (S.D.N.Y. Apr. 15, 2015).

Century appealed, repeating its contention that Global was obligated to pay a proportionate share of Century's defense costs in addition to the amount stated in the Reinsurance Accepted provision

13

of each certificate. *Glob. Reins. Corp. of Am. v. Century Indem. Co.* (*Global III*), 843 F.3d 120, 122 (2d Cir. 2016). With the support of four large reinsurance brokers as *amici curiae*, Century argued that *Bellefonte* and *Unigard* were wrongly decided. *Id.* at 126. We concluded that Century's argument was "not without force" because it was "not entirely clear what exactly the 'Reinsurance Accepted' provision in *Bellefonte* meant," making it "difficult to understand the *Bellefonte* court's conclusion that the reinsurance certificate in that case *unambiguously* capped the reinsurer's liability for both loss and expenses." *Id.* We noted that "[e]vidence of industry custom and practice might have shed light on this question, but the *Bellefonte* court did not consider any such evidence in its decision." *Id.*

We further explained that "[t]he purpose of reinsurance is to enable the reinsured to 'spread its risk of loss among one or more reinsurers,'" but "[i]f the amount stated in the 'Reinsurance Accepted' provision is an absolute cap on the reinsurer's liability for both loss and expense, then Century's payment of defense costs could be entirely unreinsured." *Id.* (quoting *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 587 (2001)). We found this possibility "in tension with the purpose of reinsurance." *Id.* We also observed that "the premium Global received was 'commensurate with its share of policy risk,'" but "[i]nterpreting the 'Reinsurance Accepted' provision as a cap for both losses and expenses, as we did in *Bellefonte*, could permit Global to receive 50% of the premium while taking on less than 50% of the risk." *Id.* Finally, we noted the *amici's* warning that "continuing to follow *Bellefonte* could have 'disastrous economic consequences'" because "potentially massive exposures to insurance companies throughout the industry would be unexpectedly unreinsured … creat[ing] a gaping hole in reinsurance

14

for many companies, and potentially threaten[ing] some with insolvency." *Id.*

We deemed these arguments "worthy of reflection" but noted "other considerations as well," such as "the principle of stare decisis" and the possibility that "reinsurers may have relied on this Court's opinions in *Bellefonte* and *Unigard* in estimating their exposure and in setting appropriate loss reserves." *Id.* We also considered Global's argument that the decision of the New York Court of Appeals in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), controlled the outcome of the case because in *Excess* the Court of Appeals "followed *Bellefonte* and *Unigard* to hold that subordinate clauses could not expand reinsurer liability 'beyond the stated limit in the policy.'" *Global III*, 843 F.3d at 127 (quoting *Excess*, 3 N.Y.3d at 583). We regarded that holding as particularly significant, explaining that "[i]f *Excess* imposes a clear rule (or a presumption) with respect to these reinsurance policies, the rule would guide our interpretation of this and substantially similar policies." *Id.* at 128. But "[i]f, on the other hand, the standard rules of contract interpretation apply, we would construe each reinsurance policy solely in light of its language and, to the extent helpful, specific context." *Id.*

We decided to "seek the views of the New York Court of Appeals on this important question" because "[t]he interpretation of the certificates at issue … is a question of New York law that the New York Court of Appeals has a greater interest and greater expertise in deciding than do we." *Id.* at 127. We accordingly certified the following question to the New York Court of Appeals:

> Does the decision of the New York Court of Appeals in
> *Excess Insurance Co. v. Factory Mutual Insurance Co.*,

15

3 N.Y.3d 577 [789 N.Y.S.2d 461, 822 N.E.2d 768] (2004), impose either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?

*Id.* at 128. The court accepted the question for its consideration. 28 N.Y.3d 1129 (2017).

The Court of Appeals answered the certified question in the negative, holding that "[u]nder New York law generally, and in *Excess* in particular, there is neither a rule of construction nor a presumption that a per occurrence liability limitation in a reinsurance contract caps all obligations of the reinsurer, such as payments made to reimburse the reinsured's defense costs." *Glob. Reins. Corp. of Am. v. Century Indem. Co.* (*Global IV*), 30 N.Y.3d 508, 511 (2017). Instead, the Court of Appeals held that "[r]einsurance contracts are governed by the same principles that govern contracts generally." *Id.* at 518. Those principles, the Court of Appeals explained, "do not permit a court to disregard the precise terminology that the parties used and simply assume … that any clause bearing the generic marker of a 'limitation on liability' or 'reinsurance accepted' clause was intended to be cost-inclusive." *Id.* at 519. The court therefore concluded that under New York law, "a limitation on liability clause" does not "necessarily cap[] all obligations owed by a reinsurer, such as defense costs, without regard for the specific language employed therein." *Id.*

Upon receipt of the answer of the New York Court of Appeals to our certified question, we remanded the case to the district court "for consideration in the first instance of the contract terms at issue,

16

employing standard principles of contract interpretation." *Glob. Reins. Corp. of Am. v. Century Indem. Co.* (*Global V*), 890 F.3d 74, 77 (2d Cir. 2018). While acknowledging that the district court's previous grant of summary judgment in Global's favor was "reasonable in light of our reasoning in *Bellefonte* and *Unigard*," we concluded that it was "now clear that the district court's determination that the contract was unambiguous was premised on an erroneous interpretation of New York state law." *Id.* We vacated the district court's judgment and instructed the district court on remand to "construe each reinsurance policy solely in light of its language and, to the extent helpful, specific context." *Id.*

On remand, the district court held an evidentiary hearing to determine whether the language of the reinsurance certificates was ambiguous and whether and how industry-specific context sheds light on the meaning of the certificates. *Glob. Reins. Corp. of Am. v. Century Indem. Co.* (*Global VI*), 442 F. Supp. 3d 576, 579 (S.D.N.Y. 2020). Century submitted four expert witness statements as direct testimony, while Global submitted two. *Id.* at 581. Century's experts contended that the facultative certificates were drafted such that the terms and conditions of the certificates would be concurrent with those of the underlying policies. *Id.* at 582. Because the underlying Century policies required Century to pay litigation expenses in addition to the policies' limits, Century's experts contended that Global was required to do so as well. *Id.* They explained that concurrency was drafted into the reinsurance certificates through the follow-form clauses and could be rebutted only by an explicit textual directive, which, they argued, the certificates do not contain. *Id.* They further explained that the purpose of the follow-form clause is to adopt the terms and conditions of the underlying insurance into the

17

reinsurance certificates without having to draft additional language, which could lead to inconsistencies or gaps in coverage. *Id.* In the view of Century's experts, the principle of concurrency was so fundamental to facultative reinsurance in the 1970s that no other interpretation of the certificates was possible. *Id.* at 583.

Global's experts, for their part, contended that the plain text of the reinsurance certificates caps all of Global's payment obligations at the dollar amount stated in the Reinsurance Accepted provision and that there was no custom or practice in the reinsurance industry in the 1970s that would warrant a different result. *Id.* They further argued that insurers acquire facultative reinsurance for a variety of reasons such that a general presumption of concurrency would be unwarranted. *Id.* Finally, Global's experts contended that claims generating substantial defense costs above liability limits had not yet emerged in the insurance industry in the 1970s and that the industry at that time would not have developed a presumption of concurrency as to defense costs. *Id.*

The district court credited the testimony of Century's experts, finding that they "offer[ed] more than enough credible evidence 'to raise a fair presumption' that these principles of concurrency were part of the reinsurance industry's customs and practices in the 1970s." *Id.* at 590 (quoting *Reuters Ltd. v. Dow Jones Telerate, Inc.*, 231 A.D.2d 337, 343 (N.Y. App. Div. 1st Dep't 1997)). Based on that testimony and the policy language, the district court concluded that "[t]he plain and unambiguous meaning of the reinsurance contracts is that the dollar amount stated in [the Reinsurance Accepted provision] caps Global's obligation to pay losses and also caps Global's obligation to pay

18

expenses when there are no losses, but does not cap Global's obligation to pay expenses when there are losses." *Id.* at 587.

In so holding, the district court rejected Global's argument that the language in the certificates' preamble providing that Global's reinsurance obligations are "subject to" the limits on liability set forth in the Reinsurance Accepted provision was sufficiently detailed and specific to override the follow-form clause and payments provision. *Id.* at 589-90. The district court also rejected Global's contention that *Bellefonte* and *Unigard* controlled, explaining that "[t]he Second Circuit's instruction in *Global III* that *Bellefonte* and *Unigard* are 'worthy of reflection' convinces this Court that even if these decisions have not been overruled, their continued applicability may be scrutinized." *Id.* at 590.

The district court denied Global's request for declaratory relief. *Id.* at 592. Global now appeals from that judgment.

### LEGAL STANDARDS

In *Global III*, we observed that "[t]he interpretation of the certificates at issue here is a question of New York law." 843 F.3d at 127. The New York Court of Appeals has since clarified that under New York law, "[r]einsurance contracts are governed by the same principles that govern contracts generally." *Global IV*, 30 N.Y.3d at 518. For that reason, "[w]e turn first to principles of contract interpretation to inform our analysis." *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 147 (2d Cir. 2017).

"The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). Given that objective, "the

19

first principle of contract interpretation" is that "where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Lilly v. City of New York*, 934 F.3d 222, 236 (2d Cir. 2019). "[T]he key inquiry at the initial stage of interpreting a contract" is therefore "whether it is ambiguous with respect to the issue disputed by the parties." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Rather, "[a]n ambiguity exists where the … contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2010) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

Whether a contract is ambiguous is "a question of law subject to our de novo review." *Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 95 (2d Cir. 2007). In determining whether a contract is ambiguous, courts "look[] within the four corners of the document, not to outside sources." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). This does not mean, however, that courts may not consider proof of custom and usage to determine ambiguity. To the contrary, "proof of custom and usage consists of proof that the language in question is fixed and invariable in the industry in question." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). While extrinsic evidence of the parties' subjective intentions "is generally

20

inadmissible to add to or vary the writing," evidence of industry custom and usage "is considered, as needed, to show what the parties' specialized language is fairly presumed to have meant." *Id.* at 466-67 (internal quotation marks and alterations omitted). If despite that evidence "the language in the … contract [remains] ambiguous," then "the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact." *State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985).[6]

When ascertaining the meaning of contractual language, "it is important for the court to read the integrated agreement 'as a whole.'" *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quoting *Law Debenture Tr. Co.*, 595 F.3d at 468). In conducting that exercise, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and alteration omitted). "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.'" *Lockheed Martin*, 639 F.3d at 69 (quoting *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998)) (alteration omitted).

---

[6] In the context of facultative reinsurance, the reinsurance certificate and the underlying policy together "constitute the fully integrated agreement." *Global IV*, 30 N.Y.3d at 519. Accordingly, where "a formal certificate of reinsurance … incorporates [an] underlying policy, the underlying policy is not considered extrinsic evidence." *Id.* (internal quotation marks omitted).

## DISCUSSION

Applying these principles, we hold that Global's obligation to pay its proportionate share of Century's defense costs is not capped by the certificates' liability limits and therefore affirm the judgment of the district court. Because the certificates do not specifically provide that the terms of Global's reinsurance differ from those of the Century policies with respect to the treatment of defense costs, the follow-form clause requires that Global's payments toward Century's defense costs be made in addition to the certificates' limits. This conclusion follows not only from the unambiguous language of the certificates but also from evidence of custom and usage concerning the central importance of concurrency to the reinsurance market when the certificates were issued.

To the extent that *Bellefonte* and *Unigard* suggest a different result, we conclude that those decisions were undermined by the New York Court of Appeals in *Global IV* and are no longer valid law in our circuit. In *Global IV*, the New York Court of Appeals held that "the 'standard rules of contract interpretation' … applicable to facultative reinsurance contracts … do not permit a court to disregard the precise terminology that the parties used and simply assume … that any clause bearing a generic marker of a 'limitation of liability' or 'reinsurance accepted' clause was intended to be cost-inclusive." 30 N.Y.3d at 518-19. That holding conflicts with our decisions in *Bellefonte* and *Unigard*, in which we held that the liability limits contained in the certificates at issue "necessarily cap[ped] all obligations owed by [the] reinsurer[s], such as defense costs, without regard for the specific language employed therein." *Id.* at 519. Because *Global IV* exposed a fundamental conflict between these precedents and "New York law as determined by the New York Court of

22

Appeals," which we are "bound to apply," *Van Buskirk v. New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003), we are "require[d] to conclude" that *Bellefonte* and *Unigard* are "no longer good law," *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 155 (2d Cir. 2015).

**I**

"[U]nder New York law … [t]he first step in interpreting a contract is to determine whether its language is ambiguous." *United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446, 451 (S.D.N.Y. 2018) (citing *Lockheed Martin*, 639 F.3d at 69) (alteration omitted). Global contends that "[t]he reinsurance contracts … are susceptible of just one interpretation," which is that the certificates "unambiguously limit Global's liability, whether for loss or expense or both combined, to the reinsurance Global accepted as the amount stated in the Declarations of each Certificate." Appellant's Br. 25, 28. In support of that position, Global notes that the preamble "provides that Global's agreement to provide reinsurance is 'subject to the … limits of liability set forth herein and in the Declarations made a part hereof.'" *Id.* at 26. This "language limiting liability," Global observes, "makes no distinction between loss or expense." *Id.* Global argues that "[t]he limits of liability referenced in the [preamble] are set forth in the Declarations, **Item 4**, under the heading '**Reinsurance Accepted**,'" which, according to Global, "sets forth the reinsurance accepted as a precise dollar figure, not as a percentage or proportion of any amount paid." *Id.* Global claims that these provisions, taken together, mean that "[a]ll amounts for loss or expenses are subject to the … limit of reinsurance accepted." *Id.* at 27.

Global further argues that the follow-form clause does not commit Global to following the Century policies with respect to the

23

treatment of defense costs. Rather, the follow-form clause merely "confirms that the Certificates provide coverage for the same types of liabilities that are covered by Century's underlying policies." *Id.* at 26. But "[t]hat 'follow-form coverage,'" Global maintains, "is nevertheless 'subject to' the stated limit as set forth in the [preamble] and specified in Item 4 [the Reinsurance Accepted provision]." *Id.*

Global's analysis is flawed because it improperly subordinates the follow-form clause to the limitations on liability referenced in the preamble and contained the Reinsurance Accepted provision. That reading of the certificates is untenable in light of the plain language of the follow-form clause, which requires the opposite approach. The follow-form clause provides that "the liability of the Reinsurer specified in Item 4 above shall follow that of the Company and, *except as otherwise specifically provided herein*, shall be *subject in all respects to all the terms and conditions of the Company's policy*." J. App'x 169 (emphasis added). The plain import of this language is that Global's liability as specified in the Reinsurance Accepted provision must conform "in *all respects*" to "*all*" terms and conditions of the Century policies unless the certificates "specifically" state otherwise. *Id.* (emphasis added). The certificates thus subject the amount of "Reinsurance Accepted" to the terms and conditions of the Century policies barring an explicit statement to the contrary; the certificates do not, as Global contends, subordinate Global's liability under the terms and conditions of the Century policies to "the stated limit as set forth in the [preamble] and specified in Item 4." Appellant's Br. 26.[7]

---

[7] To the extent that these provisions conflict, we conclude that the follow-form clause takes precedence over the preamble and Reinsurance Accepted provision. "[I]t is a fundamental rule of contract construction that 'specific

Among the "terms and conditions" of the Century policies made binding on Global through the follow-form clause is a provision stating that Century "will pay, *in addition to the applicable limit of liability* … all expenses incurred by … the Insured in any suit defended by [Century] or by others with [Century's] consent." J. App'x 154, 169 (emphasis added). Accordingly, Global must pay Century's defense costs "in addition to the applicable limit of liability" contained in the Reinsurance Accepted provision unless the certificates "otherwise specifically provide[]." *Id.*

Nowhere do the certificates "specifically provide[]" that the certificates' policy limits are inclusive of defense costs. The preamble does not so provide; as Global acknowledges, the "language limiting liability" in that provision "makes no distinction between loss or expense," Appellant's Br. 26, and thus does not "specifically" provide that the certificates' limits apply to both losses and expenses, J. App'x 169. The Reinsurance Accepted provision similarly fails to address

terms and exact terms are given greater weight than general language.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001). "Even where there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'" *Id.* at 413-14 (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:10, at 449 (4th ed. 1999)). Here, the preamble states in general terms that Global's reinsurance obligations are "subject to" the "limits of liability" set forth in the Reinsurance Accepted provision. J. App'x 193. The follow-form clause, in contrast, defines those obligations by incorporating the specific terms and conditions of the Century policies. Under "standard principles of contract interpretation," *Global V*, 890 F.3d at 77, we have no difficulty concluding that the general expression of Global's promise to reinsure is trumped by the clause that designates the specific terms on which that reinsurance is offered.

25

whether the limits stated therein are inclusive of defense costs. *See id.* at 168. Contrary to Global's argument, the failure of these provisions to address the treatment of defense costs cannot be read as a specific provision requiring non-concurrency with respect to those costs.

The payments provision also does not support the interpretation urged by Global. That provision obligates Global to pay its proportionate share of "[a]ll claims involving this reinsurance … settled by the Company" and, "*in addition thereto*," Global's "proportion of expenses … incurred by the Company in the investigation and settlement of claims or suits." *Id.* at 169 (emphasis added).[8]  It is true that, unlike the analogous provision in the Century policies, the payments provision does not expressly provide that expense payments are made "in addition to the applicable limit of liability." J. App'x 154. But the provision clearly does not, as Global contends, "specifically provide *otherwise* than the Century policies with respect to limits and expenses." Appellant's Br. 28.

In sum, nothing in the certificates "specifically provide[s]" that the certificates differ from the Century policies with respect to the treatment of defense costs. J. App'x 169. Because the follow-form clause makes Global's "liability … subject in all respects to all the terms and conditions of the Company's policy" unless "otherwise specifically provided," *id.*, Global must pay its proportionate share of

---

[8] The payments provision defines Global's "proportion of expenses" as "the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment." J. App'x 169.

26

Century's expenses "in addition to the applicable limit of liability" contained in the Reinsurance Accepted provision, *id.* at 154.[9]

## II

This conclusion finds support not only in the unambiguous language of the certificates but also in the credible "testimony regarding the relevant industry custom and practice" that Century's experts provided to the district court. *Global VI*, 442 F. Supp. 3d at 590. One expert testified that "during the 1970s and thereafter, it was the invariable custom and practice of the insurance and reinsurance industry" that "unless otherwise specifically stated, facultative reinsurance certificates covered investigation and defense expense in addition to limits of liability when the reinsured policy covered expense in addition to its limits of liability." J. App'x 289 (Hall Statement ¶ 2). The expert further testified that "[w]hile non-

---

[9] We note here that the district court erred in holding that "the dollar amount stated on the facultative certificates caps indemnity payments and also caps expense payments *when there are no losses.*" *Global VI*, 442 F. Supp. 3d at 578 (emphasis added). The district court reached that conclusion based on a misreading of a sentence in one certificate's payments provision stating that "[i]f there is no loss payment, the Reinsurer shall pay its proportion of such expenses only in respect of business accepted on a contributing excess basis and then only in the percentage stated in Item 4 of the declarations in the first layer of participation." *Id.* at 581 (quoting J. App'x 193). This sentence does not impose a cap on the amount of expenses that Global is required to pay when Century makes "no loss payment." J. App'x 193. Rather, the sentence means that in such a scenario, Global's proportion of expenses is the same as that specified in the Reinsurance Accepted provision rather than "the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment." *Id.* at 169. This error, however, had no impact on the district court's judgment because Century did pay indemnity losses on the policies at issue in this case.

27

[con]currency between the facultative certificate and the reinsured policy" was "possible," it was "rare,"[10] and thus "[t]o overcome the textual presumption of [con]currency stated in the following form provision," it was necessary "clearly and explicitly" both to "state the non-concurrency" and to "define the nature of the non-concurrency." J. App'x 295 (Hall Statement ¶ 20). According to this expert, such non-concurrency would be indicated "by endorsement" or "by checking the 'Non-Concurrent' box on the form certificate and specifically stating the non-concurrency elsewhere on the form." *Id.* But a statement of non-concurrency would not, as Global insists, be found "in the wording of the certificate form itself." *Id.*; *see also id.* at 380 (Thomson Statement ¶ 12) ("The Reinsurance Accepted provision is not a provision that is used to identify a non-concurrency.").

Because non-concurrency "would … be specifically identified and negotiated," the expert maintained that "neither the 'subject to' phrase in the certificates' preamble nor the dollar amount set forth in the certificates' 'Reinsurance Accepted' provision would have been understood in the industry to provide … a specific exception [to the

_____

[10] Two Century experts testified that in their decades of experience in the reinsurance industry, they had never encountered facultative reinsurance that was non-concurrent as to the treatment of defense costs. *See* J. App'x 348 (Manning Statement ¶ 46) ("It is *theoretically* possible for a reinsurer to decline to provide expenses in addition to policy limits even though the policy covered expenses in addition to the policy limits but, in the reinsurance I have placed on the thousands of insurance policies I have personally written, I have never once seen this happen."); *id.* at 358 (Lyew Statement ¶ 20) ("While it is theoretically possible that a reinsurer could seek to negotiate reinsurance coverage that is non-concurrent with respect to the payment of defense expenses, in my many years in the industry, I do not recall a single reinsurer seeking such non-concurrent coverage.").

presumption of concurrency] or an overall 'cap' on the reinsurer's exposure." *Id.* at 289, 295 (Hall Statement ¶¶ 2, 20). The other Century experts agreed. *See id.* at 347 (Manning Statement ¶ 45) ("Any knowledgeable and experienced insurance or reinsurance underwriter would understand that the fact that the reinsurance is 'subject to' the limits does not tell you whether expenses are payable in addition to limits, within limits or not at all."); *id.* at 360 (Lyew Statement ¶ 28) ("[T]here is no language in the certificates that would be understood by a reinsurance underwriter to identify a reinsurance limit or cap without regard to the manner in which the reinsured policy applies."); *id.* at 380 (Thomson Statement ¶ 13) ("[T]he Reinsurance Accepted provision [does not establish non-concurrency with respect to defense costs] as it is silent as to whether the amount of assumed reinsurance is cost-inclusive or cost-exclusive.").

Century's experts also explained the sound reasons underlying the presumption of concurrency in the reinsurance industry. As one expert explained, concurrency promotes efficiency in the reinsurance market by enabling reinsurers, through the follow-form clause, to "follow the liability of the specific policy being reinsured regardless of what type of policy it is and regardless of the terms and conditions contained in that policy." *Id.* at 356 (Lyew Statement ¶ 15). In accordance with that goal, the "standard language" of follow-form clauses "is intentionally broad so that the reinsurance coverage applies seamlessly to whatever the terms and conditions of the reinsured policy may be." *Id.* at 363 (Lyew Statement ¶ 35). Such is the case, for example, with Certificate X, which makes Global's reinsurance liability "subject in all respects to all the terms and conditions of the Company's policy." *Id.* at 169. Such broad follow-form coverage serves the interests of reinsurance purchasers and

29

providers alike by eliminating the need to negotiate coverage conditions and draft particularized language. These advantages help explain why "[c]oncurrency between the insurance coverage and reinsurance coverage is a fundamental feature of facultative reinsurance" that, unless otherwise provided, "includes the treatment of expense." *Id.* at 357 (Lyew Statement ¶ 18).

The Century experts offered another, perhaps even more fundamental, reason why the reinsurance industry operates under a presumption of concurrency. As Century's experts explained, "[i]t is well known and universally understood in the insurance and reinsurance industry that 'premium follows risk,'" *id.* at 306 (Hall Statement ¶ 58), meaning that "whoever takes the risk will get the premium for it," *id.* at 346 (Manning Statement ¶ 40). This principle requires concurrency as to the treatment of defense costs because otherwise, as one expert explained, the cedent "would be left with gaps in coverage and it would potentially end up keeping risk for its own account even though it had paid reinsurers all of the premium associated with that risk." *Id.* at 300-01 (Hall Statement ¶ 37). The market would not be able to sustain such a "disparity in exposure" between cedents and their reinsurers: "[n]o ceding company would accept [such] gaps in coverage while at the same time paying full premium to the reinsurers," "[o]ther reinsurers on the same layer would never accept more exposure for the same premium as received by one reinsurer for less exposure," and "insurers would not buy coverage with that sort of gap." *Id.* at 306 (Hall Statement ¶ 56). It is therefore unsurprising that in the district court proceedings, "neither Global, its fact witnesses nor its expert witnesses [could] identif[y] any … instance in which any reinsurer, pre-*Bellefonte*, asserted the

30

position that Global takes in this case." *Id.* at 382 (Thomson statement ¶ 18).[11]

This problem is illustrated by Certificate X. Under Certificate X, Global agreed to reinsure "$250,000 part of $500,000," or 50 percent, of the excess layer above Century's $500,000 retention. J. App'x 168. Because "premium follows risk," *id.* at 306 (Hall Statement ¶ 58), Global received 50 percent of the net premium paid on that layer. The risk that Century reinsured through Certificate X consisted not only of the risk that Century would suffer indemnity losses but also the risk that it would incur substantial litigation expenses defending against claims—expenses which, under the terms of the policy it issued to Caterpillar, were not subject to the policy's liability limit. Yet Global insists that Century paid it 50 percent of the net premium Century received on the excess layer in exchange for Global taking on less than 50 percent of the risk: while Century had been exposed to $250,000 in indemnity losses *and* litigation expenses in excess of that amount, Global's total exposure was purportedly capped at $250,000. Thus, in Global's view, Century decided to remain exposed to defense

---

[11] Indeed, one Century expert testified that "*Bellefonte* … [was] widely considered in the industry to be contrary to well-established industry custom and practice." J. App'x 310 (Hall Statement ¶ 68). Even though *Bellefonte* putatively benefited reinsurers, this expert testified that the decision was "decried among the reinsurer members and staff of … the Reinsurance Association of America" because it "gave opportunists an opening to deny liability for expenses that clearly were contemplated as covered when the business was written." *Id.* Yet notwithstanding that opportunity, another expert testified that "the vast majority of reinsurers continued to follow industry custom and practice by paying expenses in addition to loss limits where the reinsured policy paid expense in addition to loss," further indicating the reinsurance industry's norm in favor of concurrency as to defense costs. *Id.* at 383 (Thomson Statement ¶ 22).

costs in excess of Global's $250,000 liability cap in exchange for nothing in return. Global cannot explain why any cedent would agree to confer such a windfall on its reinsurer.[12]

Century's evidence of industry custom thus confirms what is apparent from the unambiguous language of the certificates: Global's reinsurance is concurrent with the Century policies with respect to the treatment of defense costs. For that reason, Global must pay its proportionate share of those costs in addition to the applicable liability limit for each respective certificate.

## III

To the extent that *Bellefonte* and *Unigard* suggest a different result, we conclude that those decisions were undermined by the New York Court of Appeals in *Global IV* and hold that those cases are no longer valid law in our circuit.

"[W]e of course recognize that generally 'a decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.'" *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020) (quoting *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir.

---

[12] *See* J. App'x 300 (Hall Statement ¶ 37) ("If … the Century insurance policy was understood to pay defense costs in addition to limits but the Global reinsurance certificate paid defense costs only within the limit … the reinsurance transaction would make no sense."); *id.* at 367 (Lyew Statement ¶ 44) ("If the reinsured policy paid expense in addition to loss, the reinsurance followed and paid expense in addition as well. … If any reinsurer had asserted [Global's] 'cap' position, their reinsurance would have been unmarketable."); *id.* at 348 (Manning Statement ¶ 49) ("[I]f a reinsurer tried to write reinsurance that was non-concurrent with the reinsured policy as to the treatment of expense, no reasonable insurance underwriter would buy it.").

1995)) (alteration omitted). But there are "exception[s] to this general rule." *Id.* One exception occurs because the "ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes, or authoritative court decisions of the state." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 90 (2d Cir. 2006). In such cases, "the highest court of a state has the final word on the meaning of state law," and thus "we are bound to apply New York law as determined by the New York Court of Appeals" even when a decision of the New York Court of Appeals conflicts with our precedent. *Van Buskirk*, 325 F.3d at 89 (alteration omitted). In this way, "[t]he federal Court of Appeals is in the same position as a lower state court vis-à-vis the New York Court of Appeals in construing state substantive law." *In re E. & S. Dists. Asbestos Litig.*, 772 F. Supp. 1380, 1391 (S.D.N.Y. 1991), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992). When our circuit's precedent conflicts with a more recent decision of the New York Court of Appeals as to a matter of New York law, "this court will follow the outcome it believes the New York Court of Appeals would reach, without giving binding authority to [our precedent]." *Id.*[13]

---

[13] *See also Silva v. Garland*, 993 F.3d 705, 717 (9th Cir. 2021) (stating that a federal court of appeals is "bound to reach the same result as [its] precedent" on a question of state law when "there is no intervening decision on controlling state law by a state court of last resort") (internal quotation marks omitted); *Wimbush v. Wyeth*, 619 F.3d 632, 639 n.5 (6th Cir. 2010) (explaining that "reconsideration of our precedents is justified" when intervening state appellate court decisions "provide the best indication" of how the state's highest court "would rule on [an] issue … [of] state law"); *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) ("In cases arising under a federal court's diversity jurisdiction … the federal court must defer to the most recent decisions of the state's highest court.").

The intervening state court decision does not need to contradict our precedent outright to justify a departure from it. "[F]or this exception to apply, the intervening decision need not [even] address the precise issue already decided by our Court." *Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. INS*, 336 F.3d 200, 210 (2d Cir. 2003). Rather, there need only be "a conflict, incompatibility, or 'inconsistency' between this Circuit's precedent and the intervening [state court] decision." *In re Arab Bank*, 808 F.3d at 155 (alteration omitted). Even if "[t]he effect of intervening precedent" is "subtle," as long as "the impact is … 'fundamental,'" we must "conclude that a decision of a panel of this court is 'no longer good law.'" *Id.*

Even when "there is no decision by the New York Court of Appeals," we still "must apply what we find to be New York law after giving proper regard to relevant rulings of other New York courts," *In re Elm Ridge Assocs.*, 234 F.3d 114, 121 (2d Cir. 2000) (citation and alterations omitted), because "the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity," *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). For that reason, even a development short of a decision of the highest court, if it indicates the court would decide a state-law question differently than our precedent, might call that precedent into question.

In this case, we have an intervening decision of the state's highest court. The decision of the New York Court of Appeals in *Global IV* revealed a "conflict" between the approach our court took in *Bellefonte* and *Unigard*, *In re Arab Bank*, 808 F.3d at 155, and "the 'standard rules of contract interpretation' otherwise applicable to facultative reinsurance contracts," *Global IV*, 30 N.Y.2d at 518 (internal

34

citation omitted). Although *Global IV* did not confront "the precise issue already decided by our Court" in *Bellefonte* and *Unigard*, the decision of the New York Court of Appeals and "its reasoning supporting that [decision] are sufficiently broad to support the conclusion we reach today, our prior holding[s] in [*Bellefonte* and *Unigard*] notwithstanding." *Union of Needletrades*, 336 F.3d at 210. Because "the impact" of *Global IV* on *Bellefonte* and *Unigard* is "fundamental," *In re Arab Bank*, 808 F.3d at 155, we must reexamine "our controlling precedent," *Wojchowski v. Daniels*, 498 F.3d 99, 106 (2d Cir. 2007).

In *Global IV*, the New York Court of Appeals was asked to decide whether its decision in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), "impose[s] either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs." 30 N.Y.3d at 512. The Court of Appeals answered in the negative, holding "definitively" that "*Excess* did not supersede the 'standard rules of contract interpretation' otherwise applicable to facultative reinsurance contracts," which, the Court of Appeals explained, are "the same principles that govern contracts generally." *Id.* at 518 (citation omitted). Those "principles," the Court of Appeals stated, "do not permit a court to disregard the precise terminology that the parties used and simply assume … that any clause bearing the generic marker of a 'limitation on liability' or 'reinsurance accepted' clause was intended to be cost-inclusive." *Id.* at 519. The Court of Appeals thus held that under New York law, "a limitation on liability clause" does not "necessarily cap[] all

35

obligations owed by a reinsurer, such as defense costs, without regard for the specific language employed therein." *Id.*

By so holding, the New York Court of Appeals exposed a fundamental conflict between our holdings in *Bellefonte* and *Unigard* and the "'standard rules of contract interpretation' … applicable to facultative reinsurance contracts." *Id.* at 518 (citation omitted). As noted above, in *Bellefonte*, we construed reinsurance certificates containing both a "Reinsurance Accepted" provision and a standard follow-form clause. *See* 903 F.2d at 911. Although the Reinsurance Accepted provision did not specify whether the cedent's defense costs were payable within or in addition to the policy limits, we held—without relying on any other textual support in the certificates or evidence of industry custom—that "the limitation" stated in the Reinsurance Accepted provision "is to be a cap on all payments by the reinsurer." *Id.* at 913. From that assumption we concluded that "[a]ll other contractual language must be construed in light of that cap," asserting that to "allow[] the 'follow the fortunes' clause to override the limitation on liability … would strip the limitation clause and other conditions of all meaning," which would be "contrary to the parties' express agreement and to the settled law of contract interpretation." *Id.* at 913-14. In *Unigard*, we reached the same result, holding that because the reinsurance certificate at issue "provide[d] for the policy limits," the reinsurer was "not liable for expenses beyond the stated liability limit in the Certificate," notwithstanding the language contained in the follow-form clause and in the underlying policy. 4 F.3d at 1071.

In both *Bellefonte* and *Unigard*, we thus "disregard[ed] the precise terminology that the parties used and simply assume[d] …

that … clause[s] bearing the generic marker of a 'limitation on liability' or 'reinsurance accepted' clause [were] intended to be cost-inclusive." *Global IV*, 30 N.Y.3d at 519. Rather than analyze the language of the follow-form clauses and the underlying policies, we assumed from the outset that the applicable policy limits capped the reinsurers' liability as to both losses and expenses and held that "[a]ll other contractual language must be construed in light of th[ose] cap[s]." *Bellefonte*, 903 F.2d at 914; *Unigard*, 4 F.3d at 1071. As *Global IV* makes clear, these decisions were inconsistent with "the 'standard rules of contract interpretation' … applicable to facultative reinsurance contracts," under which there is "[n]either a rule, [n]or a presumption, that a limitation on liability clause necessarily caps all obligations owed by a reinsurer, such as defense costs, without regard for the specific language employed therein." 30 N.Y.3d at 518-19 (citation omitted). In light of *Global IV*, we are "require[d] … to conclude" that *Bellefonte* and *Unigard* are "no longer good law." *In re Arab Bank*, 808 F.3d at 155 (2d Cir. 2015).

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.